**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Case No. 05-41108 |
| | ) |
| FALCON PRODUCTS, INC., a | ) JOINTLY ADMINISTERED UNDER |
| Delaware corporation, et al., | ) CHAPTER 11 |
| | ) |
| | ) Hearing Date:  March 30, 2005 |
| Debtors. | ) Hearing Time:  9:00 a.m. |
| | ) Location:        Thomas F. Eagleton |
| | )                        U.S. Courthouse |
| | )                        111 South Tenth Street, |
| | )                        Fifth Floor North |
| | )                        St. Louis, MO 63102 |
| | ) |
| | ) **LIMITED OBJECTION OF DEBTORS TO** |
| | ) **APPLICATION FOR AUTHORITY TO** |
| | ) **EMPLOY XROADS SOLUTIONS GROUP,** |
| | ) **LLC AS FINANCIAL ADVISORS FOR THE** |
| | ) **OFFICIAL COMMITTEE OF UNSECURED** |
| | ) **CREDITORS** |
| | ) |
| | ) Motion No. 265 |
| | ) |

Falcon Products, Inc. ("Falcon"), Epic Furniture Group, Inc.,[1] The Falcon

Companies International, Inc., Falcon Holdings, Inc., Howe Furniture Corporation, Johnson

Industries, Inc., Madison Furniture Industries, Inc., Sellers & Josephson, Inc., and Shelby

Williams Industries, Inc., debtors and debtors in possession in the above-captioned chapter 11

cases (collectively, the "Debtors") hereby object (the "Limited Objection") to the "Application

for Authority to Employ XRoads Solutions Group, LLC as Financial Advisors for the Official

Committee of Unsecured Creditors" (the "X Roads Application") for the reasons set forth herein.

Specifically, the Debtors object to the XRoads Application on the grounds that the

Committee has not met its burden of proof in establishing the proposed terms of XRoads'

employment are reasonable with respect to the following:

---

[1]   With the exception of Epic, all of the Debtors are wholly owned and are direct or indirect
subsidiaries of Falcon.  Falcon owns 80% of Epic, and the remaining 20% interest is owned
by three individuals who also comprise Epic's management team.

372609v8

(1)     the XRoads Application seeks to employ XRoads Solutions Group, LLC ("XRoads") solely under 11 U.S.C. § 328 and, does not provide that XRoads shall file a final application for allowance of its fees and expenses, the review of which application shall proceed on reasonableness grounds under 11 U.S.C. § 330(a) and shall not be limited to the "improvidence" standard set forth in § 328;

(2)     despite the fact that the Debtors have informed the Official Committee of Unsecured Creditors (the "Committee") that they fully anticipate that their plan of reorganization (the "Plan") will be confirmed this summer, the XRoads Application provides that XRoads shall be eligible to receive a "success fee" of $100,000 if the Debtors' plan of reorganization in the above-captioned cases (the "Plan") is confirmed within nine (9) months of entry of a final order approving XRoads' retention and, as such, if approved would confer a veritable gift on XRoads;

(3)     in providing that XRoads shall receive a "success fee" of $75,000 if the average recovery to all classes of allowed unsecured claims is greater than sixty-five percent (65%) of the amount of allowed unsecured claims as of the effective date of the Plan (and another $75,000 if the recovery is greater than 85% of such amount), the XRoads Application, if approved, would incentivize XRoads to waste the estates' resources, and possibly hold-out, in attempting to reach unattainable benchmarks; and

(4)     there is no reason to provide for a success fee to XRoads in these cases because XRoads' hourly rates will sufficiently compensate XRoads for its services as the Committee's financial advisor in connection with Plan negotiations.  Rather, if at the conclusion of these cases XRoads believes that it is entitled to an enhancement above its normal hourly rates, it may ask for an enhancement, and the Court will decide whether such enhancement is reasonable under 11 U.S.C. § 330(a).

## RELEVANT FACTS

### A.      The Debtors' Chapter 11 Filings and their Restructuring Term Sheet

1.      On January 31, 2005 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  No

2

372609v8

trustee has been appointed in these cases.  The Debtors are continuing to manage and operate their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      On or around January 26, 2005, the Debtors and OCM Principal Opportunities Fund II, L.P. ("Oaktree") and Whippoorwill Associates, Inc., as agent for certain discretionary accounts ("Whippoorwill"), (collectively, the "Plan Proponents"),[2] agreed in principal to a restructuring for the Debtors by way of a non-binding term sheet (the "Restructuring Term Sheet") from which the Plan, together with a rights offering of equity in the reorganized Debtors, each are expected to be derived.[3]  A copy of the Restructuring Term Sheet, which was attached as Exhibit "1" to the "Affidavit of Christopher Shepard in Support of Motions of Debtors in Possession for Preliminary and Final Approval of Cash Collateral and Postpetition Financing" (the "Shepard Affidavit") filed on the Petition Date, is attached hereto as Exhibit "1."

3.      In relevant part, the Restructuring Term Sheet provides that that: (i) holders of allowed trade claims will receive cash equal to the full amount of their allowed claims or otherwise be left unimpaired; and (ii) the Noteholders as well as the Debtors' other prepetition unsecured creditors (exclusive of creditors holding trade claims), will receive, on a pro rata basis, newly issued commons stock (the "New Common Stock"), of the reorganized company in an amount to be determined (subject to dilution for the Rights Offering[4] and the Management Incentive Plan (defined in the Restructuring Term Sheet), and to certain other limitations as

---

[2]   The Plan Proponents hold a majority (approximately $61,000,000) of the $100,000,000 of unsecured 11.375% Senior Subordinated Notes due 2009, which were issued by Falcon on June 17, 1999.  Collectively, the holders of these notes are referred to herein as the "Noteholders."

[3]   The treatment of claims and interests under the Restructuring Term Sheet is not binding on the Debtors or the Plan Proponents.  The Debtors and the Plan Proponents are in the process of deciding how claims and interests will be treated under the Plan.

[4]   As set forth in the Restructuring Term Sheet, the Debtors will conduct a rights offering (the "Rights Offering"), for aggregate consideration of no less than $45 million.  One or more funds managed by Oaktree and Whippoorwill (the "Backstop Parties") will provide a standby commitment pursuant to which the Backstop Parties will agreed to purchase all shares of New Common Stock offered pursuant to the Rights Offering but not otherwise subscribed for by the parties to the Rights Offering.

372609v8

discussed in the Restructuring Term Sheet.[5]  Under the terms of the Restructuring Term Sheet, the amount of New Common Stock to be distributed to holders of unsecured claims other than Trade Claims is based on a post-Effective Date enterprise value of $140 million.

4.      The Debtors' financial advisor Imperial Capital, LLC ("Imperial") has prepared a recovery analysis based on the terms of the Restructuring Term Sheet (the "Recovery Analysis"), which is attached hereto as Exhibit "2."  The Recovery Analysis assumes a $150 million enterprise value of the Reorganized Debtors, which amount is the enterprise value that the Debtors and the Plan Proponents are currently contemplating in their Plan negotiations.  The Recovery Analysis estimates pro forma debt at $142 million,[6] leaving an implied equity value of $8 million available for general unsecured creditors.  Based on such values, approximately 84.9% of the New Common Stock will be purchased through the Rights Offering, while approximately 2.5% of the New Common Stock will allocated to existing shareholders and junior convertible debenture holders.  The remaining 12.6% of the New Common Stock will be allocated among the Noteholders and other holders of allowed general unsecured claims.  According to the Recovery Analysis, the implied value of 12.6% of the New Common Stock is $6.675 million.  The Recovery Analysis further makes the "best case" assumption that all holders of trade claims will be paid in full in cash and that there will be no dilution from the Management Incentive Plan.[7]  Even with this assumption, the Recovery Analysis shows that the average recovery to all classes of allowed unsecured claims is approximately 22.8%.[8]

---

[5]   See footnote 3, supra.

[6]   As noted in footnote 4 of the Recovery Analysis, pro forma debt includes approximately $27 million currently drawn on the DIP facility, $70 million Term Loan A, and $45 million Term Loan B.

[7]   See footnote 3, supra.  Additionally, the Debtors believe that the effects of dilution from the Management Incentive Plan may be significant.

[8]   This amount of average recovery to all classes of general unsecured claims compares favorably to testimony provided to the Court thus far.  For example, in the Shepard Affidavit, the Debtors presented a liquidation analysis that demonstrated that creditors holding general unsecured claims would receive nothing on account of such claims.  (Shepard Affidavit, ¶ 34).  Additionally, the Shepard Affidavit states that the going-concern valuation of the Debtors' business is $146 million.  (Shepard Affidavit, ¶ 33).

372609v8

5.    The Recovery Analysis also contains an "Enterprise Value Sensitivity" table, which estimates the percentage of average recovery to all unsecured claims at different enterprise valuations but maintains the assumptions that all holders of trade claims will be paid in full[9] and that there will be no dilution from the Management Incentive Plan.  This table shows that the enterprise value of the Reorganized Debtors would need to be $206.2 million in order for the average recovery to all classes of allowed unsecured claims to reach 65%.  In order for the average recovery to all classes of allowed unsecured claims to reach 85%, the enterprise value of the Reorganized Debtors would need to be $232.9 million.

**B.    The Debtors' Financial Advisor**

6.    On February 14, 2005, the Debtors filed an "Application for an Order Pursuant to 11 U.S.C. §§327 and §328(a) Authorizing the Employment and Retention of Imperial Capital, LLC as Financial Advisor for the Debtors and Debtors in Possession." (the "Imperial Application")[10]  In the Imperial Application, the Debtors sought to employ Imperial pursuant to 11 U.S.C. §§ 327 and 328(a).  However, the Debtors proposed that "Imperial would still be required to file a final application for allowance of its fees and expenses, and the review of such application would proceed on reasonableness grounds under section 330(a) of the Bankruptcy Code and would not be limited to the "improvidence" standard set forth in section 328(a)."  (Imperial Application, ¶ 20).

7.    The Imperial Application detailed Imperial's history of offering financial advisory services to the Debtors, the services that Imperial would render to the Debtors if employed in these chapter 11 cases, and the compensation Imperial would receive if so employed.

8.    As set forth in the Imperial Application, since June 2004, Imperial has been actively advising the Debtors in connection with evaluating a number of strategic

---

[9]    See footnote 3, supra.

[10]    The Debtors filed an amended application to employ Imperial on February 16, 2005.  The amended Imperial application differed from the original Imperial application only insofar as the Debtors amended their signature block.  As such, the applications are collectively referred to herein as the "Imperial Application."

372609v8

alternatives, including those related to the Debtors' private debt offering in October 2004 and the Restructuring Term Sheet.  As a result, Imperial Capital has developed considerable knowledge of the Debtors' businesses by becoming intimately familiar with its business operations, capital structure, financing documents, and other material information.  Imperial invested a significant amount of time and resources prior to the Petition Date in achieving this high level of familiarity.

9.      In the Imperial Application, the Debtors detailed the services that they anticipated Imperial would render with regard to any substantial economic modification of any of the Debtors' debts or securities (a "Restructuring") or a refinancing of the existing debt of the Debtors or any other debt or equity financing for the Debtors (a "Financing").  Such services included:

(a)      assisting in the preparation of material describing the Debtors, their operations, historical performance and future prospects, including materials to be used in selling any securities of the Debtors (the "Offering Materials");

(b)      identifying and contacting selected qualified purchasers (the "Purchasers") of a proposed financing and furnishing them with copies of the Offering Materials;

(c)      assisting in the negotiation, structuring and implementation of any transaction with existing creditors;

(d)      advising the Debtors' Board of Directors, as requested; and

(e)      assisting in choosing the form and structuring, negotiating and implementing of a Restructuring and/or a Financing.

10.      Additionally, in the Imperial Application, the Debtors detailed the services that they anticipated Imperial would render with regard to a possible sale involving a substantial amount of the business or assets of the Debtors (a "Transaction").  Such services included:

(a)      advising on a proposed sale price and form of consideration;

(b)      structuring and implementing a Transaction; and

(c)      negotiating the financial aspects of any Transaction under the Debtors' guidance.

6

372609v8

11. The Imperial Application proposed that Imperial would be compensated in accordance with its normal billing practices as follows:

(a) a financial advisory fee of $75,000 per month, payable in advance on the 15th day of each month (the "Monthly Advisory Fee");

(b) a one time cash fee (the "Financing Fee") of $75,000 for post-petition financing payable upon entry of a final order by the Court approving the Debtors' post-petition credit facility (which amount already has been paid to Imperial); and

(c) to the extent the Debtors pursue and complete a Restructuring, a transaction fee ("Restructuring Fee") payable upon consummation of the Restructuring in an amount of $450,000.

12. On February 25, 2005, the Court entered the "Order Authorizing Debtors and Debtors in Possession to Employ Financial Advisor (Imperial Capital, LLC)" (the "Imperial Order"). The Imperial Order granted authorized the Debtors to employ Imperial "for the purposes set forth in the Imperial Application," and stated that:

> Imperial's fees and expenses shall be subject to the jurisdiction and approval of the Court under section 328(a) of the Bankruptcy Code, provided however, that Imperial shall file a final application for allowance of its fees and expenses, the review of which application shall proceed on reasonableness grounds under section 330(a) and shall not be limited to the "improvidence" standard set forth in section 328(a).

(Imperial Order, ¶ 3).[11]

## C. The Committee and Its Application to Employ a Financial Advisor

13. On February 11, 2005, the U.S. Trustee appointed the Committee. The Committee was amended on February 14, 2005 (docket entry no. 143) and again on March 2, 2005 (docket entry no. 224). At present, the Committee consists essentially of five (5) trade

---

[11] Moreover, the March 21, 2005 order authorizing the employment of TRG Turnaround and Crisis Management ("TRG") and John S. Sumner, Jr. of TRG as chief restructuring officer for the Debtors states that "TRG and Mr. Sumner shall be employed subject to the reasonableness standard of Bankruptcy Code section 330 and shall be compensated accordingly at the expense of the Debtors' estates, on terms set forth in the Application, and in such amounts as the Court may hereafter allow." (TRG Order, ¶ 6).

7

creditors and the Indenture Trustee for the Noteholders.  The Committee does not include any Noteholders.

14.     On February 28, 2005, the Court entered an order approving the employment of Spencer Fane Britt & Browne, LLP ("Spencer Fane") as counsel for the Committee (the "Spencer Fane Order").  Pursuant to the Spencer Fane Order:

> Spencer Fane's fees and expenses shall be subject to the jurisdiction and approval of the Court under section 328(a) of the Bankruptcy Code, provided however, that Spencer Fane shall file a final application for allowance of its fees and expenses, the review of which application shall proceed on reasonableness grounds under section 330(a) and shall not be limited to the "improvidence" standard set forth in section 328(a).

(Spencer Fane Order, ¶ 3).

15.     To the extent they may do so without revealing confidential or privileged information, the Debtors' counsel have kept the Committee apprised of the Plan negotiation process.  In particular, Debtors' counsel have informed the Committee's counsel that the Debtors anticipate that the Plan will be confirmed in the summer of 2005, and conceivably as early as June 2005.

16.     On March 11, 2005, the Committee filed the XRoads Application.

17.     The XRoads application proposes to employ XRoads as financial advisor to the Committee pursuant to 11 U.S.C. §§ 328 and 1103(b) and Rules 2014(a) and 2016 of Federal Rules of Bankruptcy Procedure.  The XRoads Application makes no mention of 11 U.S.C. § 330.

18.     The XRoads Application requests that XRoads be compensated based upon hours expended by the professionals rendering services to the Committee at hourly rates of up to $450 per hour.[12]  In addition, the XRoads Application proposes that XRoads will be eligible for a "success fee" of up to $250,000, payable as follows:

---

[12]   XRoads' maximum listed hourly rate is $500 per hour.  However, in exchange for the the success fee detailed in paragraph 9 of the XRoads Application, XRoads proposes to discount its hourly rates by ten percent (10%) for this engagement.

372609v8

a.      $100,000 if the Plan is confirmed within nine (9) months of the entry of a final order approving XRoads' retention;

b.      $75,000 in the event that the value (including cash, equity, warrants and other consideration) of the average recovery to all classes of allowed unsecured claims is greater than sixty-five percent (65%) of such allowed unsecured claims calculated as of the effective date of the Plan; and

c.      $75,000 in the event that the value (including cash, equity, warrants and other consideration) of the average recovery to all classes of allowed unsecured claims is greater than eighty-five percent (85%) of such allowed unsecured claims calculated as of the effective date of the Plan.

## ARGUMENT

**A.      As With Other Professional Employed Pursuant To 11 U.S.C. § 328 In These Cases, XRoads Should Be Subject To The Reasonableness Standard Of 11 U.S.C. § 330.**

19.      Although other professionals employed in these cases pursuant to 11 U.S.C. § 328 (including the Debtors' financial advisor and the Committee's counsel) each must file a final application for allowance of fees and expenses, the review of which application shall proceed on reasonableness grounds under section 11 U.S.C. § 330(a) and shall not be limited to the "improvidence" standard set forth in § 330, the XRoads Application does not propose to subject XRoads' employment to the reasonableness standard of § 330.

20.      "Generally, a court may not revisit the reasonableness of a fee arrangement that has been approved pursuant to section 328." In re XO Communications, Inc., 2005 Bankr. LEXIS 333, *19 (Bankr. S.D.N.Y. 2005).  Indeed, "[u]nder section 328(a), a court may not revisit its prior determination as to the reasonableness of an agreement previously approved unless it determines that the terms and conditions proved to be improvident at the time they were approved in light of then-unforeseen circumstances."  Id.

21.      Given the stringent standard of review applicable to employment applications approved solely under § 328, it is incumbent upon the Committee to establish why its financial advisor should not be subject to the same scrutiny as Imperial and other

9

372609v8

professionals in these cases who will have their fees and expenses reviewed by the Court in hindsight under a reasonableness standard.

22. The Committee has not provided any justification for employing its financial advisor under a disparate standard of review than Imperial and other professionals in these cases.  Therefore, the Debtors request that the Court deny the XRoads Application for failure to subject Xroads' compensation to the appropriate standard of review.

**B.    The Success Fee Provisions in the XRoads Application are Unreasonable and, Therefore, the XRoads Application Should be Denied.**

- **The Terms and Conditions of XRoads' Employment Must Be Reasaonble Under the Circumstances.**

23. Whether XRoads is employed under § 328, § 330, or a combination thereof, the terms and conditions of XRoads' employment must be reasonable.  A professional may be employed pursuant to 11 U.S.C. §327, in which case their fees are awarded pursuant to 11 U.S.C. §330 and reviewed under a "reasonableness standard," or employed pursuant to 11 U.S.C. §328(a), which authorizes employment and compensation of professionals under "any reasonable terms."

24. Section 330(a)(3)(A) sets forth factors that a bankruptcy court must consider in determining the amount of reasonable compensation to be awarded:

> (A)  In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including --
> (A) the time spent on such services;
> (B) the rates charged for such services;
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

25. As both § 328(a) and § 330(a)(1) use the word "reasonable," and as "[i]t is well established that identical words used in different parts of the same act are intended to have the same meaning… the Section 330(a)(1) factors may be taken into account in asking whether a

10

fee request [under § 328] is reasonable."  In re Federal Mogul-Global, Inc., 348 F.3d 390, 407-08 (3d Cir. 2003).

26.     The question of whether proposed terms are "reasonable" is determined upon a case by case basis.  Indeed, this Court has stated that "[w]hat is reasonable must be assessed with due regard for the particular and unique circumstances of each bankruptcy case and for the fair and equitable administration of the bankruptcy estate."  In re Thermadyne Holdings, Inc., 2002 Bankr. LEXIS 1735, *7 (Bankr. E.D.Mo. 2002).  Accord In re Metricom, Inc., 275 B.R. 364 (Bankr. N.D. Cal. 2002).

27.     For the reasons set forth below, not only has the Committee failed to show that the success fee proposed in the XRoads' Application is reasonable under the circumstances of these cases, but the success fee is unreasonable under such circumstances and, as such, the XRoads Application should be denied.

- **The Burden Of Proof To Justify XRoads' Employment And The Terms Thereof Lies With The Committee.**

28.     Whether a professional is employed pursuant to § 328, § 330, or a combination thereof, in determining whether an application to employ a professional should be granted, "[t]he burden of proof to establish that proposed terms and conditions of employment are reasonable is on the moving party.  The Court must be persuaded [by the party seeking employment of the professional] that the terms and conditions are in the interest of the estate." In re C&P Auto Transport, Inc., 94 B.R. 682, 686 (Bankr. E.D.Cal. 1988).  Accord In re Chas. A. Stevens & Co., 109 B.R. 853, 854 (Bankr. N.D.Ill. 1990).

29.     Accordingly, the Committee must persuade the Court that the terms and conditions pursuant to which it proposes to employ XRoads set forth in the XRoads Application are reasonable and in the best interests of the Debtors' estates.

- **The Proposed $100,000 Success Fee To Be Awarded To XRoads If The Plan Is Confirmed Within Nine (9) Months Of XRoads' Retention Is Unreasonable Because It Is Essentially A Guaranteed Bonus.**

30.     As noted above, the XRoads Application proposes to pay XRoads $100,000 "if the Debtor's [sic] Plan of Reorganization is confirmed within nine (9) months of the

11

372609v8

entry of a final order approving XRoads' retention." (XRoads Application, ¶ 9(a)).  Assuming that the Court enters an order employing XRoads on or about April 1, 2005, the $100,000 success fee would be payable to XRoads as long the Plan is confirmed by January 1, 2006.  Given the circumstances of these cases, such an award is not a "success fee" at all.  Rather, it is essentially a guaranteed bonus that will be paid to XRoads in addition to XRoads substantial hourly rates.

31.     As the Court noted at the March 17, 2005 hearing, these cases are on a "fast-track."  To date, the Debtors have made substantial progress in drafting the Plan, which is derived from the Restructuring Term Sheet.  The Debtors have informed the Committee that they anticipate that the Plan will be filed within the next few weeks and that the Plan should be confirmed in the summer of 2005, and conceivably as early as June 2005.  Thus, assuming the Court enters an order authorizing the employment of XRoads on or about April 1, 2005, the Debtors anticipate that the Plan will be confirmed within two (2) to five (5) months of entry of such order.

32.     Accordingly, the proposal to pay XRoads any amount, let alone the substantial sum of $100,000, for helping to achieve that which is a veritable certainty is unreasonable.

- **The Proposed Success Fees Based On The Average Recovery To All Classes Of Allowed Unsecured Claims Are Unreasonable Because The Benchmarks Are Unattainable And, As Such, Will Create Skewed Incentives For XRoads.**

33.     The proposed success fees of $75,000 payable to XRoads should the average recovery to all classes of allowed unsecured claims reach sixty-five percent (65%) and eighty-five percent (85%) are unreasonable in that set unattainable goals for the Committee and XRoads, which, in turn, will encourage needless and wasteful efforts from XRoads to inflate the enterprise value of the Reorganized Debtors.  Moreover, any success fee awarded to XRoads that is based upon an amount of average recovery to all classes of allowed unsecured claims is unreasonable because such a provision will necessarily result in XRoads having a direct pecuniary interest in its valuation testimony.

372609v8

34.     Utilizing the $150 million enterprise value of the Reorganized Debtors that is currently being contemplated by the parties negotiating the Plan, the Recovery Analysis shows that under the terms of the Restructuring Term Sheet, the average recovery to all classes of allowed unsecured claims is approximately 22.8%.  See, supra ¶¶ 4 –5.  Further, the Recovery Analysis' Enterprise Value Sensitivity table indicates that under the terms of the Restructuring Term Sheet, the enterprise value of the Reorganized Debtors would have to be valued (i) at $206,200 for the average recovery to all classes of allowed unsecured claims to reach sixty-five percent (65%) and (ii) at $232,900 for such recovery to reach eighty-five percent (85%).  Given these projections, the sixty-five percent (65%) and eighty-five percent (85%) benchmarks proposed in the XRoads Application cannot realistically be reached.

35.     While the Committee may argue that even if the benchmarks are unattainable it is harmless for the Court to approve success fees for reaching them, the Debtors believe that such success fees will incentivize XRoads to be recalcitrant as the Plan confirmation process progresses.  If XRoads convinces the Committee to hold out and prolong the Plan confirmation process in order for XRoads to become entitled to these success fees, substantial assets of the Debtors' estates will be wasted and valuable time will be lost.  Further, as the benchmarks are unattainable, no corresponding benefit will inhere to holders of allowed general unsecured claims.  Thus, the Court should not approve these two success fees, which will serve only to encourage obstructionist behavior on the part of XRoads.

36.     Indeed, the Court should not approve any success fee based upon the average recovery to all classes of allowed unsecured claims because any such success fee will create a built-in bias with regard to XRoads' valuation testimony.  As set forth in paragraph 5 supra, a higher enterprise valuation may result in a higher amount of estimated recovery to general unsecured creditors.  Given that XRoads will likely be testifying about the Reorganized Debtors' enterprise value, XRoads will have a direct pecuniary interest in the content of its testimony if XRoads' compensation is based in part upon the average recovery to all classes of allowed unsecured claims.  In order to ensure that XRoads does not have a financial stake in its own valuation analysis and testimony, the Court should not approve the XRoads Application so

13

372609v8

long as such application contains any success fee based upon the average recovery to all classes of general unsecured claims.

- **XRoads' Hourly Rate Is Sufficient To Fully Compensate XRoads For Its Services As Financial To The Committee, And, Therefore, The Provision Of Any Success Fee To XRoads Is Unreasonable**

37.     Any proposed success fee to XRoads is unreasonable under the facts of these cases.  Neither the Committee nor XRoads have provided any justifiable basis warranting such back-end compensation.  XRoads has proposed to be paid for its services via substantial hourly rates of up to $450 per hour.  XRoads should be and is (if employment is approved) expected to perform competently in exchange for receiving such compensation.  There is nothing unusual or particularly sophisticated about the services XRoads will be rendering to the Committee to warrant any compensation above XRoads' substantial hourly rates.

38.     Ultimately, the Committee's argument that XRoads' retention under the terms set forth in the XRoads' Application is in the best interests of the estates is conclusory. The Committee has not provided any evidence demonstrating the reasonableness of the success fee provisions.  In particular, the Committee has not submitted any evidence showing that: (1) XRoads would not perform services without the success fees; (2) no other qualified advisor could be retained without exposing the estates to additional liability as a result of the success fees and the skewed incentives they create; and/or (3) the success fees are reasonable in light of the facts of these cases and the services XRoads will be rendering.  Instead of proposing success fees in its employment application, XRoads should request a success fee at the conclusion of these cases if it believes that it is entitled to a success fee for the services it has rendered to the Committee.  The Court may then determine whether a success fee is reasonable under the circumstances pursuant to § 330(a).

WHEREFORE, the Debtors respectfully request that the Court deny the XRoads Application and deny any future application to employ XRoads as financial advisor to the Committee unless such future application (1) proposes that XRoads shall file a final application for allowance of its fees and expenses, the review of which application shall proceed on reasonableness grounds under 11 U.S.C. § 330(a) and shall not be limited to the "improvidence"

14

372609v8

standard set forth in § 328; and (2) does not provide for any success fees to be awarded to

XRoads.


DATED: March 23, 2005            Respectfully submitted,

*/s/ Andrew M. Parlen*
MARK V. BOSSI (E.D. Mo. no. 2675)
mbossi@thompsoncoburn.com
BRIAN W. HOCKETT (E.D. Mo. no. 498697)
bhockett@thompsoncoburn.com
THOMPSON & COBURN LLP
One US Bank Plaza
St. Louis, MO 63101
Telephone (314) 552-6000
Fax (314) 552-7000

ROBERT A. GREENFIELD (Cal. state bar no.
39648) rgreenfield@stutman.com
MARINA FINEMAN (Cal. state bar no. 193065)
mfineman@stutman.com
ANDREW M. PARLEN (Cal. state bar no. 230429)
aparlen@stutman.com, Members of
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067
Telephone (310) 228-5600
Fax (310) 228-5788

Reorganization Counsel for Debtors and Debtors in
Possession


<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that a copy of the foregoing was sent via U.S. mail, postage prepaid to the parties on the Master Notice List No. 2 dated March 15, 2005 (unless sent electronically, via ECF or email service to those parties on the Email Service List), and to the parties listed below, on this the 23rd day of March, 2005.

*/s/ Andrew M. Parlen*
Andrew M. Parlen


John Tittle, Jr.                      Llynn K. White and Ryan J. Mason
XRoads Solutions Group, LLC         Polsinelli Shalton Welte Suelthaus PC
325 North St. Paul Street             100 South Fourth Street
Suite 750                            Suite 1100
Dallas, TX 75201                 St. Louis, MO  63102

15

372609v8

372609v8