costs, respectively. The amounts of these adjustments are also preliminary and subject to change.

Several additional significant adjustments (which were not addressed as part of the Audit Committee Investigation) were identified during the year-end close and audit process. These adjustments include a write-off of goodwill ($117.5 million), a write-off of capitalized research and development costs ($1.0 million), a write-off of certain non-trade receivables ($1.1 million), and a write-off of unsubstantiated assets ($1.0 million). Falcon also identified currency translation adjustments which resulted in additional income of $2.0 million. The amounts of these adjustments are preliminary and subject to change.

Based on its findings, the Audit Committee determined that Falcon's financial statements for the fiscal year ended November 1, 2003 and each of the quarters thereof and the first three quarters of the fiscal year ended October 30, 2004 should not be relied upon. As a result of Falcon's current financial and internal resource constraints, it is unable to quantify the impact of the inventory write-down and other adjustments on any specific prior periods. As such Falcon is currently unable to restate prior period financial statements and does not anticipate that it will restate such financial statements in the foreseeable future.

None of the one-time officers of Falcon identified by the investigation as having any level of involvement in the accounting irregularities remains an officer of Falcon or any of the Debtors.

### F.   The Debtors' Post-Petition Operating Results And the Resulting Changes To The Non-Binding Restructuring Term Sheet.

#### 1.   The Non-Binding Restructuring Term Sheet.

In order to avoid mounting administrative costs, and to reduce the uncertainty that plagues a chapter 11 debtor's business and operations, the Debtors initiated a "fast track" reorganization, initially hoping to emerge from chapter 11 reorganization in less than six months. To that end, just prior to the Petition Date, the Debtors and the Co-Proponents agreed in principal to a restructuring for the Debtors by way of a <u>non-binding</u> term sheet (the "Restructuring Term Sheet") which was intended to form the foundation for a plan of reorganization, including a

rights offering of equity in the reorganized Debtors, which would allow the Debtors to successfully reorganize and emerge from these cases.[6]

The negotiations between the Debtors and the Co-Proponents regarding the Restructuring Term Sheet were not particularly lengthy. Indeed, those negotiations commenced in December of 2004 (just a little over one month before the Cases were commenced), when the Debtors contacted Oaktree, in its capacity as one of the larger Noteholders, to inquire about Oaktree's willingness to engage in discussions regarding a potential restructuring. At that time, Oaktree agreed to participate in those discussions and began receiving limited budget and cash flow information pursuant to the terms of a confidentiality agreement with the Debtors. The information provided to the Co-Proponents in the context of those discussions was quite limited in nature and scope.

In relevant part, the Restructuring Term Sheet contemplated that: (i) Holders of allowed trade Claims would receive cash equal to the full amount of their Allowed Claims or otherwise be left unimpaired; and (ii) the Noteholders as well as the Debtors' other prepetition unsecured Creditors (exclusive of creditors holding trade Claims), would receive, on a Pro Rata basis, newly issued common stock of the reorganized company in an amount to be determined (subject to dilution for the Rights Offering and the Management Incentive Plan (which were defined in the Restructuring Term Sheet), and to certain other limitations as discussed in the Restructuring Term Sheet). Under the terms of the Restructuring Term Sheet, the amount of new common stock to be distributed to Holders of unsecured Claims other than Trade Claims was based on a post-Effective Date enterprise value of $140 million. However, the Restructuring Term Sheet was merely a blueprint of a potential plan of reorganization. From the outset of these cases until the original Plan was filed, the Debtors emphasized that the Restructuring Term Sheet was non-binding and represented only an agreement in principle among the Debtors and

---

[6] A copy of the Restructuring Term Sheet, was attached as Exhibit "1" to the "Affidavit of Christopher Shepard in Support of Motions of Debtors in Possession for Preliminary and Final Approval of Cash Collateral and Postpetition Financing" (the "Shepard Affidavit") filed on the Petition Date.

the Co-Proponents. For the reasons stated below, the Plan differs from the Restructuring Term
Sheet.

### 2.    The Debtors' Post-Petition Operating Results And Changes To The Non-Binding Restructuring Term Sheet.

On July 20, the Debtors filed the original Plan, which differed significantly from
the non-binding Restructuring Term Sheet, as does the current version of the Plan. As discussed
below, the Debtors' postpetition operating results and a careful analysis of prepetition operations
dictated the modified restructuring provided for in the Plan. Among other things, Creditors
holding trade Claims will not be paid in full, and neither unsecured Creditors nor Interest
Holders will receive any New Common Stock in exchange for their Class 6A Claims. Instead,
Class 6A Claim Holders will now share in the Audit Committee Report Retained Rights of
Action Litigation Proceeds and the Committee's Avoiding Power Causes of Action Litigation
Proceeds (which are defined and discussed in Article VI.B.3.g below), and the Committee will
prosecute the Individual Creditor Claims that are assigned to the Creditor Trust on behalf of all
such assigning Creditors, while the Interest Holders will not receive or retain any distributions
under the Plan.

The two key Petition Date assumptions that have been adjusted as a result of
additional postpetition analysis are that: (i) sales levels and losses would continue only during
the first three months after the Petition Date, after which period operations would return to a
more normalized level; and (ii) the Debtors' gross margins at the Morristown Facility and the
Newport Facility during fiscal year 2005 would be higher than they have turned out to be. The
Debtors believed that a relatively quick operational turnaround was possible, and with additional
liquidity from the DIP Facility, on-time shipping would improve, contributing to a return to
previously projected, normalized sales in May 2005. However, the effect of the bankruptcy
filing was more pronounced and longer lasting than expected, and May and June did not see a
return to normalized sales, as they fell short of projections by $8.8 million. As a result, the
Debtors' business plan contains sales projections of $191 million for fiscal year 2006 rather than
the $258 million initially projected.

Upon completion of a more detailed plant level analysis, the Debtors and their advisors realized that the Debtors' reorganization would take longer and be more difficult than initially anticipated. Specifically, the Debtors learned that, although liquidity problems were the catalyst of the bankruptcy filing, their poor performance was primarily the result of underlying operational issues at their plants, particularly at the Morristown Facility, which were exacerbated by the Debtors' prepetition liquidity problems. It became apparent that the assumed quick operational fix to attain anticipated margins and improve on-time deliveries was not achievable without significant structural changes to the business. Accordingly, the Debtors, with the assistance of TRG, formulated a significant number of initiatives and structural changes necessary to improve operations, which are discussed at length in Article III.C above

The Debtors' lower-than-expected sales as a result of the bankruptcy filing, combined with the plant level operating difficulties, contributed to the Debtors' $8.9 million EBITDA loss (before professional fees and expenses) on a consolidated basis, in the first five months of these cases, which is $11.6 million lower than the projected EBITDA of $2.5 million. The Debtors used approximately $9.1 million of free cash flow (EBITDA less capital expenditures), during the first five months of these cases, and had estimated the generation of $1.7 million of free cash flow for the period, which necessitated the draw of $9.1 million more on the DIP Facility than was projected and the increase of the debt to be satisfied at exit.

As a result of this shortfall, in June 2005, the Debtors determined that they required a modification to the availability formulas included in the DIP Loan Agreement, in order to receive additional liquidity, and they obtained an additional $8 million in availability (see discussion in Article III.C.1 above). Due to postpetition results (specifically sales are $12.7 million lower than initially projected resulting in an additional draw of $9.1 million under the DIP Facility) and the fact that the turnaround would be lengthy and involve greater execution of risk than initially anticipated, it became apparent that the Debtors would need to amend the original plan as contemplated in the Restructuring Term Sheet. In order for the Debtors to have enough liquidity both to implement the operational restructuring and attract investment capital,

the Debtors needed to radically change the use of proceeds of any new capital invested.
Accordingly, the Restructuring Term Sheet contemplated a $45 million Rights Offering
(backstopped by the Co-Proponents and/or certain of their affiliates), the proceeds of which were
going to be used to pay off the Term B Loan, resulting in a net cash investment of $0. Assuming
no other participation in the Rights Offering, for that $45 million, assuming approximately
$87 million of debt upon exit, the Co-Proponents and/or certain of their affiliates would have
received approximately 85% of the equity of the Reorganized Debtors plus their pro rata share of
the equity received by the Noteholders (60% of 12.5%), or approximately 93% of equity at exit.
To summarize, under the Restructuring Term Sheet, assuming there would be approximately
$87 million of debt at exit, the Co-Proponents would have received 93% of the equity and would
not have made any new investment.

However, as the result of this change of course, the Debtors have been forced to
adjust their exit financing and post-confirmation operating strategy after they determined that
plan or reorganization under the terms of the Restructuring Term Sheet would simply not be
feasible. The Plan now reflects an increased investment by the Post-Confirmation Term B
Secured Lenders and the Backstop Parties from $45 million to $50 million through the
$20 million Post-Confirmation Term B Secured Loan and the $30 million Rights Offering they
are backstopping. *See* Articles VI.E.3 and VI.E.4 below. Also, rather than using the proceeds to
repay the Term B Loan, the capital invested is now going to be used to pay down a $25 million
portion of the Term A Loan and some of the DIP Facility, with the balance of the DIP Facility to
be refinanced through the Exit Facility. Furthermore, assuming a $65.8 million Rights Offering
Equity Value, under the Plan, the Holders of the Term B Loan would receive approximately 54%
of the New Common Stock with the balance of 46% going to the participants of the Rights
Offering, subject to dilution of the Management Incentive Plan. Assuming no other unsecured
Creditors participate in the Rights Offering, the Term B Secured Lenders and the Backstop
Parties together would hold 100% of the equity at exit. Assuming full participation by other
unsecured Creditors, the Co-Proponents would hold 68% of the equity at exit. In addition, the

Class 6A Claim Holders will now have the opportunity to share in any recovered Audit Committee Report Retained Rights of Action Litigation Proceeds, and the Committee's Avoiding Power Causes of Action Litigation Proceeds on the terms described in Article VI.B.3.g below. With these revised terms incorporated, the Debtors are confident that the Plan is feasible, as is discussed more fully in Article VIII.E below.

### 3. The Debtors' Need To Emerge From Chapter 11 By The End Of October 2005.

The Debtors are at a crucial point in their chapter 11 cases, and it is critical to the Debtors' continued operations and successful reorganization that they be able to exit from chapter 11 on schedule, which means having the Plan go effective by the end of October 2005. The Debtors' business is viable only if the Debtors are able to obtain the $50 million of new capital (of which approximately $21 million will provide additional liquidity) which they will receive under the Plan upon Confirmation before the end of October 2005. Further, the Debtors' key customers and vendors, as well as their employees, are anxiously awaiting signs that the Debtors are making progress toward emerging from chapter 11. The Debtors have significant concerns about the willingness of these constituencies to continue to support the Debtors if there are delays in the expected emergence date. Absent the additional liquidity and debt reduction provided for under the Plan of Reorganization on the slated timetable, the ability of the Debtors' business to survive will be jeopardized.

### G. Bar Date For Prepetition Claims.

By order dated March 10, 2005 (the "Bar Date Order"), the Bankruptcy Court set May 2, 2005, as the deadline for Filing proofs of Claims against the Debtors by most Creditors (the "Bar Date"). However, the bar date for certain types of Claims, such as Claims of governmental entities, is August 1, 2005, as set forth in the Bar Date Order. The Debtors have also filed a motion seeking to extend the Claims bar date for the SEC to November 1, 2005, in exchange for the SEC's agreement that, to the extent the SEC has any Claims against the Debtors on the basis of the findings in the Audit Committee Report or on any other basis, such Claims, if

any, will be treated as General Unsecured Claims under the Plan. The notice of the Bar Date was
sent to Creditors on or about March 18, 2005.

1.     **Estimated Amounts Of Claims.**

The Debtors estimate that the total amount of Claims against them as of the

Petition Date, on a consolidated basis and excluding intercompany Claims, was approximately

$278,929,534.42, broken down by Claim category as follows:

| Type Of Claim | Amount |
|---|---|
| Fleet Revolver Claims, Term Component Loan Lender Claims, | $21,141,968.00 This amount was paid in full postpetition. *See* Article III.B.1 above. |
| Term A Secured Lenders' Claims | $70,965,611.00 |
| Term B Secured Lenders' Claims | $45.7 million |
| Other Secured Claims | $64,306.00 |
| Unsecured Priority Claims | $947,198.23 |
| General Unsecured Noteholder Claims | $107,000,000.00 |
| Other General Unsecured Claims | $33,110,451.19 |

Since the Petition Date, claimants have filed approximately 983 proofs of Claim

with the Bankruptcy Court, in an aggregate amount of approximately $2,539,877,709.00.

However, this number is highly inflated and not indicative of the Debtors' prepetition obligations

to Creditors. The exaggerated aggregate sum of the Filed Claims is primarily the result of

Creditors having Filed Claims, and often for multi-million dollar amounts, either multiple times

or against multiple Debtors on account of the same obligation. In addition to these claims listed

above, the Debtors may also be liable for certain pension obligations in the event the Debtors'

three pension plans are terminated, as discussed below.

*The Debtors reserve any and all rights, except as expressly stated in the Plan, to
object to or defend against any Claim asserted against them.*

a.     **Contingent PBGC Claims.**

The Pension Benefit Guaranty Corporation ("PBGC") is a United States

government corporation, and an agency of the United States created by the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended, to administer the pension plan termination

insurance program established under Title IV of ERISA, 29 U.S.C. §§ 1301-1461. The PBGC guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. The Debtors are either the contributing sponsors or members of the controlled group of the contributing sponsors of the Debtors' following three defined benefit pension plans: (i) Falcon Product, Inc. Retirement Plan, (ii) Shelby Williams, Inc. Employees' Pension Plan; and (iii) Sellers and Josephson, Inc. Employees' Pension Plan (collectively, the "Pension Plans"). The Pension Plans are covered by Title IV of ERISA.

The Debtors have initiated a termination of all of the Pension Plans by filing with PBGC Notices of Intent to Terminate the Pension Plans by distress termination under section 29 U.S.C. § 1341(c). An underfunded pension plan may be terminated voluntarily if its contributing sponsor and each member of the controlled group of the contributing sponsor meets one of the financial distress tests set forth in 29 U.S.C. § 1341(c)(2)(B). As part of obtaining a distress termination process, the Debtors will also seek an order from the Bankruptcy Court finding that: (1) unless the Pension Plans are terminated, the Debtors will be unable to pay their debts pursuant to a plan of reorganization and will be unable to continue in business outside the reorganization process and (2) the termination should be approved. In addition, the Debtors will seek to establish that the contributing sponsors of the Pension Plans and each member of the controlled group of the contributing sponsors meets one of the distress criteria tests.

On April 29, 2005, the PBGC filed a total of eighty-one unliquidated claims (the "PBGC Claims"), against the Debtors for the following asserted amounts owed: (i) contingent, priority claims for the Pension Plans' unfunded benefit liabilities under 29 U.S.C. § 1362(b); (ii) contingent, priority claims for unpaid minimum funding contributions under 29 U.S.C. § 1362(c), with respect to, and on behalf of the Pension Plans; and (iii) priority claims for premiums under 29 U.S.C. § 1306 and 1307. The Debtors dispute the asserted priority status of the PBGC's Claims, and reserve any and all rights to object to or defend against the PBGC Claims or any other grounds. The Debtors are jointly and severally liable for the PBGC's

Claims. The PBGC Claims for unfunded benefit liabilities and minimum funding contributions are contingent upon the termination of the Pension Plans.

In the event that the Pension Plans are not terminated: (i) the Debtors will continue to be obligated to fund the Pension Plans in accordance with the minimum funding standards under ERISA and the Internal Revenue Code, to pay all required PBGC insurance premiums, and to continue to administer and operate the Pension Plans in accordance with their terms and ERISA's provisions; (ii) the Debtors' reorganization proceedings and the Plan will not in any way be construed as discharging, releasing or relieving the Debtors, the Reorganized Debtors, or any other party in any capacity, from any liability with respect to the Pension Plans or any other defined benefit pension plan under any law, governmental policy or regulatory provision; and (iii) the PBGC and the Pension Plans will not be enjoined or precluded from enforcing such liability as a result of the Plan's provisions or the Plan's confirmation.

**H.     Actual and Projected Recovery of Preferential or Fraudulent Transfers.**

Pursuant to section 547 of the Bankruptcy Code, the Debtors have standing to file actions to recover "preferential transfers" made to insiders within the one-year period prior to the Petition Date, and to non-insider Creditors within the ninety-day period prior to the Petition Date. The Debtors have not yet conducted a complete analysis of payments made to insiders within the one-year period preceding the Petition Date, or to non-insider Creditors within the ninety-day period preceding the Petition Date, to determine whether or not any of these payments constitute recoverable preferential transfers. However, the Debtors' preliminary review of the payments made within one year of the Petition Date indicates that, on an overall basis, there was a reduction of approximately $2,805,000 in the Debtors' outstanding accounts payable during the one-year period prior to the Petition Date, from January 2004 to January 2005. There was a further reduction of approximately $1.5 million in the Debtors' accounts payable during the three month period just before the Petition Date, from October 2004 to January 2005. Attached hereto as Exhibit "5" is a list of all such payments the Debtors made to non-insider Creditors within ninety days of the Petition Date, and all transfers made to insiders

within one year of the Petition Date. The Debtors have not conducted an in-depth analysis of these transfers and believe that many of them may not be avoidable preferences because they were not payments on account of antecedent debts, were made in the ordinary course of business, or were contemporary exchanges for new value.

Pursuant to section 548 of the Bankruptcy Code, the Debtors have standing to file actions to set aside "fraudulent transfers" made within one year of the Petition Date. Pursuant to section 544 of the Bankruptcy Code, the Debtors have standing to file such actions on the basis of similar statutes under state law. Under most state law fraudulent transfer statutes, the Debtors have the right to avoid fraudulent transfers made within four years of the transfer date. In summary, a fraudulent transfer is a transfer of property that was made for less than reasonably equivalent value, and either that was made while the transferor was insolvent or that rendered the transferor insolvent. As with potential preferential payments, the Debtors have not yet analyzed their books and records in sufficient detail to determine whether transfers made by the Debtors to insiders or to non-insiders are avoidable as fraudulent transfers under sections 544(b) or 548 of the Bankruptcy Code.

To the extent that any payments to Creditors (whether insiders or non-insiders) appear to be legally recoverable under these sections or any other section of the Bankruptcy Code, and the recovery effort would be cost-effective, the Debtors have reserved the right pursuant to the Plan to take whatever actions are necessary to recover such transfers. *See* Article VI.X hereof.

## IV.

## FINANCIAL PROJECTIONS AND VALUATIONS.

**A.     Financial Projections.**

**1.     Overview.**

In connection with the Plan, certain projections of the future financial performance of the Debtors were prepared. Attached hereto as Exhibit "3" are the consolidated financial projections of the Reorganized Debtors ("Projections") that incorporate the estimated

effect of the transactions contemplated by the Plan on the Reorganized Debtors' capitalization, statement of operations, balance sheets, and cash flow for the year ending October 29, 2005, the stub period ending December 31, 2005 and the four years ending December 31, 2006 through 2009.

The Projections reflect significant assumptions, including various assumptions with respect to the anticipated future performance of the Reorganized Debtors after the restructuring contemplated under the Plan is consummated, industry performance, general business and economic conditions, and other matters. Many of the assumptions involve conditions that are beyond the control of the Reorganized Debtors. Any future changes in these conditions may materially impact the Reorganized Debtors ' ability to achieve the Projections. The Projections should be read in conjunction with the assumptions and qualifications contained therein.

In addition, unanticipated events and circumstances may affect the actual financial results of the Reorganized Debtors in the future. THEREFORE, WHILE THE PROJECTIONS ARE PRESENTED FOR THE PROJECTED PERIOD, ACTUAL RESULTS MAY VARY FROM THE PROJECTED RESULTS. NO REPRESENTATION, GUARANTY, OR WARRANTY CAN BE MADE OR IS MADE WITH RESPECT TO THE ACCURACY OF THE PROJECTIONS OR THE ABILITY OF THE REORGANIZED DEBTORS TO ACHIEVE THE PROJECTED RESULTS.

The Debtors do not, as a matter of course, make public projections of their anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that the Reorganized Debtors will, and disclaim any obligation to, furnish updated projections in the event that actual industry performance or the general economic or business climate differs from that upon which the Projections have been based. Further, the Debtors do not anticipate that the Reorganized Debtors will include such information in documents required to be filed with the SEC, or otherwise make such information public.

## B.    Valuations Of The Reorganized Debtors.

Imperial Capital has acted as financial advisor for the Debtors in the Cases.  In connection with Imperial Capital's engagement, the Debtors requested that Imperial Capital analyze the value of the Reorganized Debtors on the Effective Date (the "Reorganization Value").

While assisting the Debtors in determining the Reorganization Value, Imperial Capital assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors.

These analyses do not constitute a recommendation to any holder of Claims against the Debtors as to how to vote on the Plan.  Imperial Capital's estimate of the Reorganization Value does not constitute an opinion as to the fairness from a financial point of view of the potential consideration to be received under the Plan or of the terms and provisions of the Plan.

In arriving at its valuation, Imperial Capital: (i) reviewed the Plan and certain related documents, as well as publicly available business and financial information relating to the Debtors; (ii) reviewed other information relating to the Debtors, including the Projections; (iii) met with the Debtors' management to discuss the Debtors' business and prospects; (iv) reviewed financial data of the Debtors and compared that data with similar data for other publicly held companies in businesses similar to the Debtors and considered, to the extent publicly available, the financial terms of certain transactions that have recently been effected; and (v) considered other information, financial studies, analyses and investigations, and financial, economic, and market criteria that it deemed relevant.  Imperial did not value any of the Reserved Rights of Action, including Audit Committee Report Retained Rights of Action, or any of the Committee's Avoiding Power Causes of Action in performing its valuation.

In connection with its review, Imperial Capital did not assume any responsibility for independent verification of any of the information that was provided to, or otherwise reviewed by, it and relied on that information being complete and accurate in all material

respects. With respect to financial forecasts, Imperial Capital was advised, and assumed, that the
Projections were reasonably prepared on bases reflecting the best currently available estimates
and judgments of the Debtors' management as to the future financial performance of the
Reorganized Debtors after giving effect to the proposed restructuring. NO REPRESENTATION
OR WARRANTY, EXPRESS OR IMPLIED, CAN BE OR IS MADE BY THE DEBTORS,
IMPERIAL CAPITAL, OR THE DEBTORS' MANAGEMENT AND OTHER
PROFESSIONALS AS TO THE ACCURACY OR ACHIEVABILITY OF ANY SUCH
VALUATIONS, ESTIMATES, AND/OR FORECASTS, AND THE DEBTORS, IMPERIAL
CAPITAL, AND THE DEBTORS' MANAGEMENT AND OTHER PROFESSIONALS
EXPRESSLY DISCLAIM ANY AND ALL LIABILITY RELATING TO OR RESULTING
FROM THE USE OF THIS MATERIAL. In addition, Imperial Capital assumed that the
restructuring would be completed in accordance with the terms of the Plan without any
amendments, modifications, or waivers and also assumed that, in the course of obtaining the
necessary judicial, regulatory, and third party consents for the proposed restructuring and related
transactions, there will be no delays, modifications, or restrictions imposed that will have a
material, adverse effect on the contemplated benefits of the proposed restructuring to the
Debtors. Imperial Capital was not requested to, and did not, make an independent evaluation or
appraisal of the individual assets or liabilities, contingent or otherwise, of the Debtors. Imperial
Capital's valuation analyses were based on information available to, and financial, economic,
market, and other conditions as they existed and could be evaluated by, Imperial Capital on the
date of this Disclosure Statement. Actual results may vary from such estimates, valuation, or
forecasts and such variations may be material.

　　　　　Imperial Capital estimates that the Reorganization Value of the Reorganized
Debtors is approximately $117.5 million, with a valuation date of July 20, 2005.

　　　　　Imperial Capital performed various financial analyses to arrive at the estimation
of the Reorganization Value, including the following, which are discussed in detail below:
(i) comparable transaction multiples, where Imperial Capital derived transaction multiples of

certain acquisitions of companies that Imperial Capital deemed to be comparable to the business

of the Debtors and then applied those multiples to the Reorganized Debtors' estimated fiscal year

ending 2005 revenues and projected fiscal year ending 2006 EBITDA; (ii) comparable trading

multiples, where Imperial Capital derived trading multiples of certain companies that Imperial

Capital deemed to be comparable to the business of the Debtors and then applied those multiples

to the Reorganized Debtors' estimated fiscal year ending 2005 revenues and projected fiscal year

ending 2006 EBITDA; and (iii) a discounted cash flow analysis, where Imperial Capital, using a

weighted average cost of capital, computed the present value of the free cash flows for the period

covered by the Projections, and the terminal value of the Reorganized Debtors.

### Market Approach/Comparable Trading Multiples

In arriving at the estimation of the Reorganization Value, one of the approaches

Imperial Capital utilized was the market approach. The market approach most commonly

incorporates use of the public company market multiple and the similar transactions multiple

methods.

The analysis of comparable trading multiples involves identifying a group of

publicly traded companies that are representative of the industry in which the Debtors operate

and then calculating multiples of various operating results such as revenues, EBITDA and EBIT

to determine the enterprise value of these companies. This analysis relies on the assumption that

the value that the market places on the equity and debt of comparable companies, given certain

operating statistics, is indicative of the value of the Debtors' current and future prospects. The

ranges of multiples derived are then applied to the Reorganized Debtors' projected operating

results to yield a range of implied reorganization values of the Reorganized Debtors.

In selecting the comparable companies, Imperial Capital searched for companies

with lines of business, market size, growth prospects and operations characteristics similar to the

Reorganized Debtors. Truly comparable companies are very often difficult to obtain and such

analyses are limited by sample size and availability of market values and meaningful operating

data. In their analysis, Imperial Capital used ten comparable companies including the following:

(i) Chromcraft Revington Inc. (CRC); (ii) Flexsteel Industries Inc. (FLXS); (iii) Furniture Brands International (FBN); (iv) Kimball International Inc. (KBAL); (v) MITY Enterprises Inc. (MITY); (vi) O'Sullivan Industries Holdings Inc. (OSULP); (vii) Steelcase Inc. (SCS); (viii) Virco Manufacturing Corp. (VIR); (ix) Herman Miller, Inc. (MLHR); and (x) HNI Corp (HNI).

In estimating the Reorganized Debtors' reorganization value under this approach, Imperial Capital selected revenue and EBITDA multiples (certain outliers were excluded) ranging from 0.5x – 0.7x and 5.5x and 6.5x, respectively. These multiples reflect the last twelve months of operating results of the publicly traded companies. The ranges of multiples were then applied to the Reorganized Debtors' projected fiscal year ending 2005 revenue and 2006 EBITDA to yield an average Reorganization Value of $100.0 million.

### Market Approach/Comparable Transaction Multiples

In the similar transactions multiple method, consideration is given to prices paid in recent transactions that have occurred in the subject company's industry or in related industries. In estimating the Reorganized Debtors' reorganization value under this approach, Imperial Capital analyzed eight acquisitions in the Debtors' industry. Of the eight analyzed, only four had publicly filed information to arrive at transaction multiples. Based on those four, Imperial Capital concluded that appropriate ranges of multiples for the Reorganized Debtors are 0.5x – 0.7x revenue and 7.7x to 8.7x EBITDA. The ranges of multiples derived were then applied to the Reorganized Debtors' projected fiscal year ending 2005 revenue and 2006 EBITDA to yield an average Reorganization Value of $117 million.

### Income/Discounted Cash Flow Analysis

Finally, Imperial Capital applied the income method – discounted cash flow analysis ("DCF Approach"). The DCF Approach involves determining the present value of the Reorganized Debtors' future debt-free operating cash flows and the terminal value at the end of the projected period.

This analysis is a "forward looking" approach and relies on the Reorganized Debtors' ability to project future cash flows accurately. Imperial Capital used the Projections to arrive at projected debt-free operating cash flows. The expected future cash flows were then discounted by the weighted average cost of capital ("WACC"). The selection of an appropriate WACC is a subjective exercise, requiring an analyses of the Debtors' operations as well as analyses of comparable companies and rates of return. The Debtors' WACC was determined by analyzing the Debtors' operations and the WACCs of comparable companies, among other things. In valuing the Reorganized Debtors, discount rates of between 16% and 18% were used.

The terminal value is calculated using two methods: the Gordon growth method and an EBITDA exit multiple. The EBITDA exit multiple is calculated by using an estimated terminal year EBITDA multiple of 6.5x and applying it to the Reorganized Debtors' projected EBITDA. The Gordon growth method assumes perpetual growth of 3.0% in debt-free cash flows. The projected debt-free cash flows and terminal value of both methods are discounted using the WACC to yield an average Reorganization Value of $127 million.

THE PREPARATION OF VALUATION ANALYSES IS A COMPLEX ANALYTICAL PROCESS INVOLVING VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THOSE METHODS TO PARTICULAR FACTS AND CIRCUMSTANCES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND IMPERIAL CAPITAL. THE VALUATION INDICATED BY IMPERIAL CAPITAL'S ANALYSES IS NOT NECESSARILY INDICATIVE OF THE PRICES AT WHICH THE NEW COMMON STOCK MAY BE BOUGHT OR SOLD OR PREDICTIVE OF FUTURE FINANCIAL RESULTS OR VALUES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE INDICATED BY THE ANALYSES. ACCORDINGLY, IMPERIAL CAPITAL'S ANALYSES AND ESTIMATES ARE INHERENTLY SUBJECT TO SUBSTANTIAL UNCERTAINTY.

The foregoing estimates of the Reorganization Value of the Reorganized Debtors
are based on a number of assumptions including the successful reorganization of the Debtors'
business and finances in a timely manner, the implementation of the Debtors' business plan, the
achievement of the forecasts reflected in the Projections, market conditions as of July 20, 2005,
and the Plan becoming effective in accordance with its terms, on a basis consistent with the
estimates and other assumptions discussed herein.

<h3 style="text-align:center">V.</h3>

<h2 style="text-align:center">ADDITIONAL CONSIDERATIONS REGARDING RISK</h2>

The following disclosures are not intended to be inclusive and should be read in
connection with the other disclosures contained in this Disclosure Statement and the Exhibits
hereto. You should consult your legal, financial, and tax advisors regarding the risks associated
with the Plan and the distributions you may receive thereunder.

**A.      Risks Relating To The Bankruptcy.**

*The Plan May Not Be Confirmed Which Could Have A Material Adverse Effect
On The Debtors.*

There can be no assurance that the requisite acceptances to confirm the Plan will
be received. Even if the requisite acceptances are received, there can be no assurance that the
Bankruptcy Court will confirm the Plan. A nonaccepting Creditor of the Debtors might
challenge the adequacy of the Disclosure Statement or the balloting procedures and results as not
being in compliance with the Code and/or the Federal Rules of Bankruptcy Procedure and the
Local Rules of the Bankruptcy Court (collectively defined as the "Bankruptcy Rules"). Even if
the Bankruptcy Court were to determine that the balloting procedures and results were
appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that
any of the statutory requirements for confirmation had not been met.

The confirmation and consummation of the Plan are also subject to certain
conditions. If the Plan were not to be confirmed, it is unclear whether the restructuring could be
implemented and what distribution holders of Claims ultimately would receive with respect to

their Claims.  If an alternative plan of reorganization could not be agreed to and confirmed, it is possible that the Debtors would have to liquidate their assets, in which case the Debtors believe that it is likely that Holders of Claims would receive substantially less than the treatment they will receive pursuant to the Plan.

*The Debtors Face Uncertainty With Respect To Certain Material Contractual Arrangements Which May Be Affected By Certain Provisions Of The Code.*

The Debtors are parties to various material contractual arrangements under which the commencement of the reorganization cases and any other transactions contemplated by the Plan could, subject to the Debtors' rights and powers under sections 362 and 365 of the Bankruptcy Code: (i) result in a breach, violation, default, or conflict; (ii) give other parties thereto rights of termination or cancellation; or (iii) have other adverse consequences on the operations of the Debtors or the Reorganized Debtors.  The magnitude of any such adverse consequences may depend upon, among other factors, the diligence and vigor with which the other parties to such contracts may seek to assert any such rights and pursue any such remedies in respect to such matters, and the ability of the Debtors or the Reorganized Debtors to resolve such matters on acceptable terms through negotiations with such other parties or otherwise.

**B.**    **Risk Factors Relating To The Business.**

*The Reorganized Debtors Will Have Significant Cash Requirements Following The Confirmation Of The Plan.*

In addition to cash generated by operations, the Debtors' principal sources of liquidity following their emergence from bankruptcy will be the Exit Facility, and the proceeds from the Rights Offering and the Post-Confirmation Term B Secured Loan.  After the Effective Date, the Debtors expect that in addition to working capital requirements, repayment of the Reorganized Debtors' obligations under the Exit Facility, the Amended Term A Loan Agreement, and the Post-Confirmation Term B Secured Loan will impose liquidity requirements on the Reorganized Debtors.  Any increase in the interest rate pertaining to this indebtedness may reduce the funds available to the Reorganized Debtors for their future operations.

While the Debtors believe that they will have adequate liquidity to meet requirements following the Effective Date, no assurances can be made in this regard. Furthermore, the ability of the Reorganized Debtors to gain access to additional capital if needed, whether through equity offerings or debt financing, cannot be assured. Any inability of the Reorganized Debtors to service their indebtedness, obtain additional financing, as needed, or comply with the financial covenants contained in the debt instruments issued pursuant to the Plan could have a material adverse effect on the Reorganized Debtors.

### *The Reorganized Debtors May Not Be Able To Manage Their Business Effectively If They Are Unable To Attract And Retain Key Personnel.*

The senior management of the Debtors currently consists of an interim chief executive officer and an interim chief financial officer. It is anticipated that these positions will be filled on or after the Effective Date, but the Debtors have not yet identified the successors. The success of the Plan is highly dependent upon the ability of the Reorganized Debtors to attract and retain qualified employees and upon the ability of Reorganized Falcon's senior management and other key employees to implement the Plan. The Debtors believe there are only a limited number of qualified executives in the industry in which they compete. The loss of the services of certain key members of the Debtors' management team could seriously harm their efforts to successfully implement the Plan. In light of the fact that the Debtors are currently implementing the Consolidation Plan, pursuant to which a number of key positions are being relocated to Morristown, Tennessee, the Reorganized Debtors may be unable to retain certain employees who choose not to relocate. The inability to attract and retain other talented personnel could also affect the Reorganized Debtors ability to successfully implement the Plan.

### *The Audit Committee Investigation Has Concluded That There Were Accounting Errors And Irregularities During Certain Periods Prior To The Petition Date; Falcon Has Been Unable To Restate Its Financial Statements For Prior Periods.*

Following an internal investigation, on June 21, 2005, Bryan Cave presented the Audit Committee Report to the Board of Directors. Based on the Audit Committee Report, the

Audit Committee determined that, as a result of accounting errors and irregularities, Falcon's financial statements were materially misstated for the year ended November 1, 2003 and for the first three quarters of the fiscal year ended October 30, 2004. Although the amount of the adjustments resulting from such errors and irregularities has been quantified, as a result of its current financial and internal resource constraints Falcon is currently unable to quantify the impact of the adjustments on prior periods. As such, Falcon has been unable to restate financial statements for such periods and such financial statements will not be available to investors in the Rights Offering. The unavailablility of audited financial statements for fiscal 2003 and fiscal 2004 could also affect future financing transactions.

### *The Debtors Are The Subject Of Inquiries By Governmental Authorities And May Face Liabilities Depending On The Outcome Of Such Inquiries.*

As described in Article III.E hereof, the SEC and the United States Attorney for the Eastern District of Missouri are each conducting an inquiry into certain matters relating to Falcon's financial statements and accounting for periods prior to the Petition Date. In addition, Falcon has received a request from the Missouri Department of Securities for a copy of the Audit Committee Report. There can be no assurance that actions taken by the SEC, the United States Attorney's Office or the Missouri Department of Securities will not have a material adverse effect on the Reorganized Debtors.

### *The Debtors Have Not Done A Comprehensive Review Of Internal Controls.*

The Audit Committee concluded as part of its investigation that former management had not put in place policies and procedures to assure the integrity of Falcon's financial reporting. The Debtors have not done a comprehensive review of internal controls. While the Debtors have put in place new controls and are continuing to seek to improve their internal controls, they have not fully implemented recommendations from past or current auditors regarding the improvement of internal controls, and there can be no assurance that there are not material continuing deficiencies in the design and or operation of the Debtors' internal controls.

### *The Debtors Do Not Have A Fully Integrated Perpetual Inventory System.*

The Audit Committee Investigation concluded that Falcon had overstated the value of its inventory leading to the write-off of approximately $33.3 million of inventory. While the Debtors have made significant improvements in their inventory accounting practices, they do not yet have a fully integrated perpetual inventory system. Until a fully integrated perpetual inventory system is put in place, the Reorganized Debtors could be impaired in their ability to effectuate product planning and other business strategies.

### *The Reorganized Debtors' Future Profitability Is Dependent On The Success Of The Consolidation Plan.*

As discussed in Article III.C hereof, the Debtors have been diligently moving forward with implementing a Consolidation Plan to strengthen their market position by, among other things, consolidating operations, eliminating redundancies, outsourcing certain manufacturing needs, growing their international design and sourcing capabilities and eliminating certain product lines and changing their product mix. The Reorganized Debtors' ability to improve their margins and to achieve the Projections is dependent upon, among other things, the success of the Consolidation Plan.

### *The Current And Prolonged Downturn In The Cyclical Office Furniture Industry Could Adversely Impact The Reorganized Debtors' Revenues And Profits.*

Office furniture industry revenues are impacted by a variety of cyclical macroeconomic factors such as corporate profits, non-residential fixed investment, white-collar employment growth, and commercial office construction. Other influences on the industry include technology changes, organizational change, health and safety concerns, including ergonomic considerations, and the globalization of companies. The Debtors have faced one of the most significant downturns in the history of the global furniture industry beginning in fiscal 2002 and continuing through fiscal 2005. Demand for furniture products has continued to fluctuate as corporate profits have remained under pressure during recent years.

There can be no assurance that current or future economic or industry trends will
not have an adverse effect on the Reorganized Debtors' business, operating results or financial
condition.

### *The Reorganized Debtors Will Operate In A Highly Competitive Environment And May Not Be Able To Compete Successfully.*

The office furniture industry is highly competitive, with a number of competitors
offering similar categories of product. While competitive factors vary geographically and
between differing sales situations, typical factors include: price, delivery and service, product
design and features, product quality, strength of dealers and other distributors, and relationships
with customers and key influencers, such as architects, designers and facility managers. Most of
the Debtors' competitors have a substantial installed base of products that can be a source of
significant future sales through repeat and expansion orders. These competitors manufacture
products with strong acceptance in the marketplace and are capable of developing products that
have a competitive advantage over the Debtors' products. The Reorganized Debtors will face
significant price competition from their competitors, which tends to intensify during an industry
downturn. This price competition could impact the Reorganized Debtors' ability to implement
price increases or, in some cases, such as during an industry downturn, maintain prices, which
could adversely affect product margins.

### *The Reorganized Debtors' Success Depends On A Number Of Factors, Including Product Quality, Positive Brand Reputation And Competition.*

The Reorganized Debtors' success will depend upon many things, including their
ability to continue to manufacture and market high quality, high performance products at
competitive prices. Their success will also be dependent on their ability to sustain their positive
brand reputation and recognition among existing and potential customers.

The Reorganized Debtors also will face significant price competition from
competitors and may encounter competition from new market entrants including those from

lower cost countries. Due to the prolonged industry recession and the resulting excess capacity, competition for project business has intensified leading to increased product discounts.

### The Reorganized Debtors Could Be Adversely Affected By Increasing Raw Material Costs.

The Debtors currently procure raw materials from a significant number of sources. These raw materials are not rare or unique to the industry. Steel and other commodity costs, such as energy, have significantly increased in recent months due to changes in global supply and demand. These changes could lead to supply interruptions. The Reorganized Debtors' margins could be affected if these types of costs remain high or escalate further. The Reorganized Debtors may not be successful in passing along a portion of the higher raw materials costs to their customers because of competitive and marketing pressures.

### The Reorganized Debtors' Financing Agreements Will Include Financial Covenants That Impose Substantial Restrictions On Their Financial And Business Operations.

The terms under the financing agreements will restrict the Reorganized Debtors' ability to, among other things, incur additional indebtedness, pay dividends or make other payments on investments, consummate asset sales or similar transactions, create liens, merge or consolidate with any other person, or sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of their assets. The terms of the agreements will contain covenants that will require the Reorganized Debtors to meet certain financial tests to avoid a default that might lead to accelerated repayment of the facilities. If the Reorganized Debtors were not able to comply with these covenants, the outstanding obligations under these facilities could be accelerated and become due and payable immediately.

C.    **Risks Relating To The Rights Offering And The New Common Stock.**

*Once An Electing Holder Exercises The Rights, Such Electing Holder May Not Revoke The Exercise.*

Once an Electing Holder exercises the rights by executing a Subscription Rights Election Form and a Shareholders' Agreement (and delivering five stock powers, executed in blank in the form of Exhibit "A" to the Shareholders' Agreement), unless the Debtors materially amend the terms of the Rights Offering, such Electing Holder cannot revoke the exercise even if such Electing Holder learns information about the Debtors that is considered unfavorable before the expiration date. Eligible Class 6A Claimholders should not exercise their rights unless they are certain that they wish to purchase Rights Offering Shares at the Subscription Purchase Price.

*An Electing Holder Will Not Know The Number of Rights Offering Shares It Has Purchased, The Precise Purchase Price, Or The Percentage Of The Equity Such Shares Will Represent.*

An Electing Holder will be obligated to fund the Purchase Price for its participation in the Rights Offering on the Rights Offering Purchase Date, which will occur at least three Business Days prior to the Effective Date. As is discussed in greater detail in Article VI.E.4.b hereof, the Purchase Price will be based on the ratio of an Electing Holder's Agreed Class 6A Claim to the entire Class 6A Claim pool, which percentage will then by multiplied by the $30.0 million Rights Offering Amount to arrive at the Purchase Price. However, at the time that an Electing Holder irrevocably elects to become an Electing Holder, it will only know the maximum Purchase Price it will be obligated to pay rather than the exact Purchase Price, as the Purchase Price will change if such Electing Holder's Agreed Class 6A Claim is less than the amount of the Class 6A Claim that such Electing Holder believes it is holding at the time of election. Moreover, from the time that an Eligible Class 6A Claimholder irrevocably elects to become an Electing Holder until the Effective Date, such Electing Holder will not know how many Rights Offering Shares it will have purchased, the precise Purchase Price, or what percentage of the equity of the Reorganized Debtors such shares will represent.

If the Subscription Share of an Electing Holder will have been rounded to zero in accordance with the definition of Subscription Share (as discussed above), the Purchase Price will be refunded to such Electing Holder as soon as practicable after such determination is made. However, if the Subscription Share of an Electing Holder is at least one Rights Offering Share but not a whole number of Rights Offering Shares then, and if such Subscription Share will have been rounded up to the nearest whole share in accordance with the definition of Subscription Share, in order to purchase the full number of Rights Offering Shares which such Electing Holders is entitled to purchase pursuant to the rounding provisions which apply to the Rights Offering, as discussed in the Plan, such Electing Holder will have pay to Reorganized Falcon an amount equal to (x) the fraction of a share so rounded up multiplied by (y) the Subscription Purchase Price. Otherwise, such Electing Holder's Rights Offering Shares will be rounded down, and the difference in the price refunded, as is discussed in more detail in Article VI.E.4.h hereof.

*To Participate In The Rights Offering, Electing Holders Must Act Promptly And Follow Instructions Carefully.*

To exercise rights to purchase the Rights Offering Shares, Eligible Class 6A Claimholders should act promptly after the information regarding the Purchase Price and the Rights Offering Funding Date is disseminated, and should follow the subscription instructions carefully.

Eligible Class 6A Claimholders who desire to purchase Rights Offering Shares must act promptly upon notice from the Debtors to ensure that all required forms and payments are actually received by the Debtors by the respective deadlines. If an Eligible Class 6A Claimholder fails to complete and sign the required Subscription Rights Election Form and Shareholders' Agreement (and delivers five stock powers, executed in blank, in the form of Exhibit "A" to the Shareholders' Agreement), sends an incorrect Purchase Price and does not correct such error prior to the Right Offering Funding Date, or otherwise fails to follow the subscription procedures that apply to the desired transaction, the Debtors may, depending on the